563 So.2d 855 (1990)
LOUISIANA STATE BAR ASSOCIATION
v.
Daryl GOLD.
No. 88-B-0645.
Supreme Court of Louisiana.
June 14, 1990.
Rehearing Denied September 5, 1990.
*856 Wood Brown, III, Thomas O. Collins, Executive Counsel, Cheri A. Cotogno, Asst. Counsel, State Bar Ass'n New Orleans, Carrick R. Inabnett, Monroe, for Louisiana State Bar Ass'n, plaintiff-applicant.
Daryl Gold, pro se.

Disciplinary Proceedings
CALOGERO, Chief Justice.[*]
The Committee on Professional Responsibility of the Louisiana State Bar Association investigated three specifications of misconduct on the part of one of its members, Daryl Gold. The specifications concern three distinct matters. They involve Gold's dealings during 1984 with his clients Suzanne Hernandez Fisher, James and Betty Freasier, and Melissa Condon. In a fourth specification of misconduct, the Committee alleged that respondent failed to cooperate in its investigations of the Fisher, Freasier and Condon matters.
In accordance with the provisions of Article XV of the Articles of Incorporation of the LSBA and the Rules of this Court, the Committee held an investigative hearing on February 3, 1988. The facts concerning the first three specifications were generally not contested by respondent, who represented himself at the hearing. Those facts and our findings are described below.

Specification No. 1
In this specification, regarding Suzanne Fisher (formerly Suzanne Hernandez), the Committee alleges that Gold commingled his client's funds and converted them to his own use in violation of Disciplinary Rule 9-102 §§ (A)-(B)[1] of the Code of Professional *857 Responsibility and that he neglected a legal matter entrusted to him in violation of DR 6-101 § (A)(3). The Committee also charged Gold with misconduct under DR 1-102.[2]
Suzanne Fisher retained Gold in 1980 regarding a personal injury matter; she gave Gold a power of attorney, as she was in the Army and being transferred to Germany. She complained to the Committee when after several years she was unable to contact Gold regarding the status of her case. In August, 1984 Gold accepted a draft from Allstate Insurance Company in settlement of Fisher's claim against Allstate's insured in the sum of $3,500.00. He deposited the draft in his trust account.[3] Two months later, in October, 1984, he issued a check to Fisher drawn on his trust account in the amount of $2,333.33, representing Fisher's portion of the settlement proceeds. Ms. Fisher negotiated the check but it was returned to her, "Non Sufficient Funds." Upon instruction from Gold, Fisher redeposited the check in January, 1985. This time it was honored by the bank.
At the Committee's investigative hearing, Gold acknowledged that he wrote the Fisher check against insufficient funds. He admitted that this evidenced commingling. He disagreed with the Committee's characterization of this transaction as a conversion, arguing that the client received all the monies due her, and in just over two months. The record does not indicate that Gold intended to permanently deprive Fisher of her funds.
Although the Commissioner did not make a finding that Gold violated DR 9-102 (commingling), he concluded that respondent engaged in professional misconduct in violation of DR 1-102, supra footnote 2, and neglected a legal matter entrusted to him, in violation of DR 6-101 § (A)(3). The Commissioner also noted that respondent's conduct violated Rules of Professional Conduct 1.15, requiring separation of client and attorney funds,[4] 1.3, requiring reasonable *858 diligence and promptness in the representation of clients, and 8.4, which defines professional misconduct.
Gold's taking four years to settle his client's case, standing alone, does not warrant imposition of discipline. He was, however, guilty of commingling client's funds, as admitted and as evidenced by the return of the Fisher check for insufficient funds. Although Gold made the check good in under three months this nonetheless constitutes misconduct on Gold's part and merits discipline.

Specification No. 2
In specification No. 2, the Committee charged Gold with commingling and converting his clients' funds in violation of DR 9-102(B)(3), supra, with neglecting a legal matter entrusted to him in violation of DR 6-101 § (A)(3), and with misconduct in violation of DR 1-102, supra.
James and Betty Freasier retained Gold in 1983 to handle for them the sale of certain real estate. In December, 1983 Gold received a $5,000.00 down payment from the purchaser, and held it in escrow until the closing. In January, 1984 Gold issued a check to his clients, the Freasiers, for $2450.00. That sum apparently represented the portion of the $5000.00 downpayment which was due his clients at the closing. Gold's bank returned the check to the Freasiers marked "Non Sufficient Funds." At Gold's instruction, the Freasiers redeposited the check; it was again returned to them for "Non Sufficient Funds." Three months after issuing the first check which bounced and after telephone conversations with Mrs. Freasier in early March, Gold wired the Freasiers $2,250.00, an amount $200.00 less than the original check. At the February 3, 1988, investigative hearing, Betty Freasier testified that at some earlier time the real estate agency handling the sale had informed her that the amount owed them by Gold was $2,485.00, $35.00 more than the original check and $235.00 more than the amount wired by Gold. She testified that, at the time of the Committee's investigative hearing, Gold still owed them $235.00.
Testifying on his own behalf, Gold stated that in 1984, apparently in response to correspondence from Mrs. Freasier, he instructed his secretary to remit $235.00 to the Freasiers by personal money order; however, he had retained no proof that such a money order was sent. He admitted the Committee's allegation that he had commingled funds (made evident when the check drawn on the trust account bounced). Subsequent to the Committee's hearing and without documentary proof regarding the Freasiers' claim for an additional $35.00, Gold remitted $235.00 to the Freasiers by money order.
The Commissioner concluded that respondent commingled funds in violation of DR 9-102 §§ (A)-(B), supra, committed misconduct in violation of DR 1-102, supra, and neglected a legal matter in violation of DR 6-101 § (A)(3). The Commissioner also noted that respondent's conduct violated Rules of Professional Conduct 1.15, supra, (regarding maintaining separate client and attorney funds), 1.3 (regarding representing clients with reasonable diligence and promptness), and 8.4 (defining professional misconduct).
This Court finds that Gold commingled his clients' funds, as he admitted, and that he failed to reimburse his client promptly. The amount withheld for a substantial period was small ($200.00) yet respondent failed to make it good until after disciplinary proceedings had begun. Such misconduct merits discipline.

*859 Specification No. 3
In the third specification of error, the Committee charged Gold with commingling and converting his client's funds, with refusing to timely furnish such funds to the client, with failing to furnish an accounting for such funds, in violation of DR 9-102 §§ (A)-(B), supra, with misconduct in violation of DR 1-102, supra, and with neglect of a legal matter entrusted to him in violation of DR 6-101 § (A)(3).
Melissa Condon retained Gold to handle her father's succession, collect insurance proceeds and investigate a possible worker's compensation claim regarding her father's September 8, 1983, death from an on-the-job injury. Condon destroyed her file in this matter prior to receiving notice of the Committee's investigation; according to Gold, his file was missing. The available record indicates that, on January 17, 1984, Gold obtained a judgment of possession in connection with the succession. The record also indicates that in the early stages of representing Condon, Gold remitted $4,000.00 to his client, representing the proceeds due her under a policy with State Farm Insurance Company. The record also indicates that Gold received a check in the amount of $7,995.00 dated July 12, 1984, from the American Family Life Assurance Company payable to Melissa Condon as Administratrix of her father's estate. Gold negotiated the check. It is not clear whether Condon signed the check; she denies signing the check, while Gold recalls her having come into his office and signing it.
In August of 1984, just a few weeks after Gold had received the $7995.00 American Family Life check, Condon, dissatisfied with Gold's handling of her case, approached a second attorney, Clay F. Tillman, Jr., and asked for assistance in discovering the proper amount of funds to which she might be entitled. At Tillman's request, Condon secured her file from Gold, and Tillman thereupon began representing her in these matters.
On December 3, 1984, in response to correspondence from Tillman, Gold remitted $11,000.00 for Condon. In a letter to Tillman dated January 15, 1985, Gold indicated that he had received a total of $22,995.00 on behalf of Condon and that he had paid her $20,000.00 to that date. After deducting $989.06 in legal fees for his work in handling the succession, Gold forwarded to Tillman a second and final payment for Condon in the amount of $2,005.94.
Condon complained to the Bar Association about Gold's handling of her case, on two occasions. First, in January, 1985, after Gold had forwarded the $11,000.00 payment to Tillman, Condon wrote the Committee to complain that Gold had improperly withheld her insurance proceeds. In July, 1985 Condon wrote the Committee again, this time complaining that Gold's $989.06 fee for handling the succession was undeserved.
At the Committee's investigative hearing, Gold admitted only that he had not timely given Condon her money; he asserted, however, that she did fully receive what was due her. Gold disagreed with the Committee's contention that he did not cooperate with attorney Tillman after Condon hired him. Tillman confirmed that Gold's cooperation with him about this matter was full and complete and that Gold's disclosures throughout were truthful. Tillman also testified that Condon and he were satisfied that Gold ultimately transmitted all the money that was due Condon.
The Commissioner found that respondent committed misconduct in violation of DR 1-102, supra. Like the Committee, the Commissioner concluded that Gold violated DR 9-102 § (B)(3), supra, by failing to render an accounting for the client's funds in his possession, and violated DR 6-101 § (A)(3) by neglecting a legal matter entrusted to him. The Commissioner noted that respondent's failure to render a full accounting also violated RPC 1.15, supra.
This Court finds no evidence or admission that Gold commingled Condon's funds. Rather, we find delay on respondent's part in remitting the money due his client and failure to furnish an accounting for the funds received on the client's behalf. The evidence in the record is incomplete concerning what money was received by Gold, when it was received, and to whom it was *860 payable. For example, the $7995.00 check was issued to Condon as Administratrix of her father's succession. Even assuming that all succession work had been completed and that Condon was entitled to collect immediately the full proceeds of each check received by Gold on behalf of Condon or on behalf of Condon as the succession's Administratrix, Condon was nevertheless fully compensated by Gold in January of 1985, within six months of Gold's receipt of the $7995.00 check from American Family Life Assurance Company. Although Gold was in error by failing to provide a formal accounting to his client of all funds received by him on her behalf, an offense deserving of discipline, the record does not permit a finding of commingling in this matter.

Specification No. 4
In the fourth specification of error, the Committee charged that Gold failed to cooperate with the Committee's investigations, specifically that he: (1) did not furnish documentary proof of the payment made to Fisher; (2) did not appear pursuant to a subpoena in the Freasier matter, leading the Committee to file a Motion for Citation for Contempt; (3) did not produce documentary evidence of payment to the Freasiers of $235.00, or proof that the downpayment received by him on behalf of the Freasiers was held in trust; (4) did not appear pursuant to a subpoena in the Condon matter, leading the Committee to file a Motion for Citation for Contempt; and (5) did not furnish documentary proof that the funds he received on behalf of Condon were held in trust.
In his testimony at the investigative hearing, Gold admitted that his cooperation with the Committee "left a lot to be desired." In response to the Committee's allegations that he failed to answer the Committee's requests for documentary proof in the Fisher and Freasier matters, Gold stated that he did not willfully fail to provide the documents, rather that he was simply unable to locate them. Regarding the subpoena and the subsequent Citation for Contempt in the Condon matter, Gold explained that after discussing the matter with counsel for the Committee, he had erroneously concluded that he had complied with the Committee's request for information and was no longer required to appear pursuant to the subpoena. He noted that he did comply with the Contempt Citation by appearing at the Bar Association's offices as ordered.
This Court finds that respondent did not furnish the Committee with the evidence requested in a timely fashion and that he failed to comply with the Committee's requests and subpoenas, resulting in the Committee's obtaining orders from this Court mandating respondent's cooperation. Respondent has explained that his failure to cooperate was not willful. We agree that respondent's conduct toward the Committee was not flagrantly uncooperative; nonetheless, the Court finds that respondent's cooperation with the Committee was wanting.
In his Findings of Fact and Conclusions of Law, the Commissioner recommended that this Court discipline respondent by means of a six-month suspension from the practice of law.
Initially, the Committee concurred. Subsequently, however, in a Supplemental and Amended Response, the Committee opposed in part the Commissioner's findings and conclusions, taking issue with the Commissioner's recommended discipline. The Committee argued in brief that respondent's acts warrant disbarment.
Respondent, on the other hand, urges a third disciplinary alternative. Relying on L.S.B.A. v. Longenecker, 538 So.2d 156 (La.1988), respondent suggests that the appropriate discipline would be a probationary period subject to whatever terms and conditions this Court may choose to impose.
The Committee moved on February 2, 1990, to set this case for oral argument and argument was scheduled for April 30, 1990. In the interim, this Court repealed, vacated, and reenacted Rule XIX of the Rules of the Supreme Court of Louisiana, the reenacted provisions being effective April 1, 1990, "to all disciplinary proceedings arising after (April 1, 1990) and to all disciplinary proceedings pending on (April 1, 1990) in *861 which a commissioner's hearing has not been held." La.S.Ct.R. XIX § 32, 555 So.2d (March 15, 1990). The Commissioner's hearing in the instant case was held on August 4, 1988, and this proceeding is thus not governed by the new Rule.
Nonetheless, in keeping with the implementation of the new disciplinary process, and because the Committee on Professional Responsibility was replaced on April 1, 1990, by the Disciplinary Board, this Court granted the Interim Chief Disciplinary Counsel's April 16, 1990, motion to substitute for the Committee on Professional Responsibility as petitioner in this matter. During oral argument, Disciplinary Counsel recommended that appropriate discipline would be for respondent to serve a two-year probationary period under the supervision of Judge James E. Clark of the First Judicial District Court.
Before reciting our findings on the proper discipline to be imposed, we summarize the facts concerning each of the charged offenses. First, for his client Fisher, respondent settled a case and obtained a net of $2333.33 on her behalf. Although his check to her was originally written against insufficient funds, thus evidencing commingling, the check cleared within three months of issuance and long before any complaint or notice to respondent from the Bar Association.
As for the Freasiers, although Gold's January, 1984 check to them bounced twice, evidencing commingling, three months after issuance of the original NSF check Gold wired the Freasiers all but $200 of the NSF check. It then took approximately four years to make good on the shortage. In fact, he eventually sent $235.00, without acknowledging that any more than $200.00 was due.
In the Condon matter, respondent failed to provide accurate records of the funds received and disbursed by him on his client's behalf. He arguably delayed making payments to her; however, we find no commingling of this client's funds.
Finally, although respondent was not flagrantly uncooperative with the Committee, his conduct in this regard was less than acceptable.
We have stated that "the discipline to be imposed will depend upon the seriousness of the offense involved and the facts and circumstances of each case." Louisiana State Bar Ass'n v. White, 538 So.2d 256, 261 (La.1989). This Court recognizes that the choice of sanctions is not governed by strict rules but rather depends on the degree of attorney misconduct. Louisiana State Bar Ass'n v. Hinrichs, 486 So.2d 116, 120 (La.1986). The Court therefore considers the following factors when imposing discipline in cases of commingling and conversion: whether the lawyer acts in bad faith or intends a result inconsistent with his client's interest; whether the lawyer commits fraud or forgery in connection with the offense; the magnitude and duration of the deprivation; the magnitude or risk of damage, expense or inconvenience to the client; whether the lawyer makes restitution; and whether such restitution is before or after disciplinary or legal proceedings. Hinrichs, 486 So.2d at 123; Louisiana State Bar Ass'n v. Longenecker, 538 So.2d 156 (La.1988).
As we explained in Hinrich, a suspension of one year or less is typically imposed when the attorney is not grossly negligent in withdrawing or retaining a client's funds, when the disciplinary violation is not accompanied by other fraudulents acts, when the client is not seriously harmed or threatened with harm by the attorney's actions and when full restitution is made promptly, usually before the client brings disciplinary complaints or legal proceedings. Hinrich, 486 So.2d at 123. Mitigating factors, such as the absence of prior disciplinary offenses and the attorney's cooperation with the Committee are also usually present when the Court imposes a suspension of one year or less. See Louisiana State Bar Ass'n v. White, 538 So.2d 256 (La.1989) (three month suspension imposed when attorney negligently failed to maintain sufficient funds in a trust account to pay clients' claims, to render prompt accountings and to promptly turn over funds and there was no evidence of intent *862 to deprive clients of funds or that clients were placed at risk due to attorney's conduct); Louisiana State Bar Ass'n v. Larre', 457 So.2d 649 (La.1984) (six month suspension imposed for attorney's commingling clients' funds when attorney had no prior disciplinary violations, was experiencing a period of severe emotional stress, and each of his clients was reimbursed); Louisiana State Bar Ass'n v. Hopkins, 447 So.2d 464 (La.1984) (one year suspension imposed when attorney failed for over four months to pay client her funds and only mitigating circumstances were absence of prior disciplinary offenses and attorney's allegedly inefficient staff and busy summer schedule).
By contrast, the Court imposes disbarment when the attorney's conduct causes harm to the client, results from bad faith, occurs in combination with other fraudulent acts, and when reimbursement is only made following the institution of disciplinary or other legal proceedings. Hinrichs, 486 So.2d 122. See, e.g., Louisiana State Bar Ass'n v. Lindsay, 553 So.2d 807 (La. 1989) (disbarment imposed when attorney repeatedly failed to maintain sufficient funds in his trust account to pay sums due his clients, refused to return unearned fees, and subjected his clients to additional difficulties by failing to promptly secure and pay over funds to which they were entitled).
We have examined the various proposals for discipline in this case and are of the opinion that a six month suspension is warranted taking into consideration the nature of the offenses, the absence of evidence indicating that respondent intended to defraud his clients, and the presence of mitigating circumstances.
Several factors indicate that respondent's conduct merits a six-month suspension rather than more severe discipline. During the Committee's investigative hearing, respondent offered into evidence the name of the psychiatrist who had treated him for depression during the time these offenses occurred. Respondent also testified that the pressures which contributed to his committing these offenses also eventually prompted him voluntarily to cease practicing law for a period of one and one-half years, from August of 1985 through the end of 1986. During that time, respondent worked for an independent insurance adjusting company. Additionally, in his testimony before the Committee, respondent expressed remorse for his conduct and did not seek to excuse or lighten the seriousness of these matters. Respondent has had no prior disciplinary charges.
We are bolstered in our belief that discipline more severe than a six month suspension is not warranted, despite respondent's admission that he commingled clients' funds, by the unanimous opinion expressed to the Justices of this Court in an April 19, 1990, letter from Chief Judge John R. Ballard on behalf of the nine judges of the First Judicial District Court. That letter was not in evidence before the Commissioner. The Interim Chief Disciplinary Counsel, having had an opportunity to protest our considering this letter, did not do so. Had the Disciplinary Counsel protested, we would be disinclined to consider the judges' belated intercession on Gold's account, or, at most, we might consider sending the matter back to the Commissioner for supplementation of the record regarding mitigation and aggravation. Rather than protest, however, Disciplinary Counsel satisfied himself that Judge Ballard's letter accurately reflected the judges' opinions of respondent's conduct and conceded that he was impressed.[5] The Disciplinary Counsel's position and the judges' opinions prompt us to make use of respondent's good record to impose a discipline less harsh than that suggested by the Committee in its brief.
Additionally, this Court has recognized that delay in pressing and concluding disciplinary actions constitutes an ordeal which punishes a respondent over and beyond the *863 discipline imposed by this Court. Louisiana State Bar Ass'n v. Edwards, 387 So.2d 1137, 1139 (La.1980); see also Louisiana State Bar Ass'n v. Daye, 427 So.2d 840, 842 (La.1983) (Dennis, J., concurring). In this instance, the respondent's offenses occurred approximately six years ago. The Committee's investigative hearing was not held until four years after the offenses. In mitigating the discipline imposed, this Court takes into consideration unreasonable delay in imposing discipline on an attorney who has used the intervening years wisely in rehabilitating himself before the bar. Edwards, supra.
Although we realize that any commingling is serious and inexcusable, respondent's offense is not as grave as many such offenses we have had occasion to review. In this case, either the amount at issue has been relatively small or respondent has restored the clients' funds in a relatively short span of time. A six month suspension from the practice of law will serve the purposes of disciplinary proceedings, that is, to maintain appropriate standards of professional conduct and thus safeguard the public; to preserve the integrity of the legal profession; and to deter other attorneys from engaging in violations of the standards of the profession. Louisiana State Bar Ass'n v. White, supra, at 261. We appreciate the harsh nature of a suspension, even a brief suspension, of an attorney who has reestablished a legal practice and is now being called upon to answer for acts committed six years earlier. However, that these offenses were committed in the fairly distant past and that respondent has reformed his conduct as an attorney are the factors which prompt us to impose a relatively brief suspension rather than a more lengthy suspension, or the disbarment recommended by the Committee.

DECREE
For the foregoing reasons, Respondent Gold is suspended from the practice of law for six months, effective upon finality of this judgment.
SIX MONTH SUSPENSION FROM THE PRACTICE OF LAW IMPOSED.
NOTES
[*] Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore.
[1] In specifications one through three the Committee charged Gold with violating DR 9-102 §§ (A)-(B). That rule provides, in pertinent part:

A. All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank or insured depository institution accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
1. Funds reasonably sufficient to pay bank charges may be deposited therein.
2. Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
B. A lawyer shall:
1. Promptly notify a client of the receipt of his funds, securities or other properties.
2. Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
3. Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
4. Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties coming into the possession of the lawyer which the lawyer is entitled to receive.
Disciplinary Rule 9-102 §§ (A)-(B), Code of Professional Responsibility, Articles of Incorporation of the L.S.B.A. art. XVI, La.R.S. 37 ch. 4 app. (repealed effective January 1, 1987).
[2] In specifications one through three the Committee charged Gold with violating DR 1-102. That rule provides:

(A) A lawyer shall not:
(1) Violate a disciplinary rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turptitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
Disciplinary Rule 1-102, Code of Professional Responsibility, Articles of Incorporation of the L.S.B.A. art. XVI, La.R.S. 37 ch. 4 app. (repealed effective January 1, 1987).
[3] The draft bore endorsements by both Fisher and Gold.
[4] That rule provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a bank or similar institution in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.
Rule of Professional Conduct 1.15, Articles of Incorporation of the L.S.B.A. art. XVI, La. R.S. 37 ch. 4 app. (adopted effective January 1, 1987).
[5] In the letter, Judge Ballard stated: "Daryl Gold has observed the highest standards of professional conduct during these past three years. We know him to be an excellent attorney whose professional conduct has been exemplary. He has been zealous in the representation of his clients and maintained an excellent relationship with opposing counsel as well as the court."